UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NUMBER 3:06-CR-75 RM |
| | ) | |
| TERRY REED | ) | |

OPINION AND ORDER

This case came before the court on July 31 for hearing on Terry Reed's motion to suppress evidence taken from his person, his car, and his home on March 26, 2006. For the reasons that follow, the court denies his motion.

I

All of the events pertinent to today's motion occurred in South Bend, Indiana on March 27, 2006. The events began when South Bend Police Corporal Scott Severns saw a black Cadillac Escalade run a stop light. Cpl. Severns recognized the Escalade's driver as Terry Reed. Undercover police officers had been involved in controlled purchases of crack cocaine from a residence at 4009 Bonfield, where Mr. Reed was thought to live with his girlfriend, Johanna Foster. Cpl. Severns believed Mr. Reed was wanted on an outstanding arrest warrant and that Mr. Reed's driver's license was suspended. Cpl. Severns radioed for a marked police car to execute a traffic stop. The parties' dispute over the facts leading to that directive is discussed later in this opinion.

Cpl. Michael Ingle and Sgt. Lucas Battani stopped the Escalade at Western Avenue's intersection with Iowa Street, near a Family Dollar parking lot. The

officers ordered Mr. Reed from the Escalade and arrested him. Cpl. Ingle ordered Mr. Reed to place his hands on the Escalade's rear and patted him down. Cpl. Ingle's search of Mr. Reed's pockets uncovered a plastic bag of crack cocaine and more than $5,000 in cash. Cpl. Severns ordered that the Escalade be impounded. The time listed on Mr. Reed's traffic citations is 3:45 P.M.. The tow truck arrived at 4:05 P.M., fifteen minutes after it was called.

After reading Mr. Reed the *Miranda* warnings, Cpl. Severns conducted—and recorded—two interviews with Mr. Reed. In the first interview, Mr. Reed told Cpl. Severns that the crack in his pockets was for personal use; that he never sold crack and knew no one who did; that he was on probation; that he lived at 1805 Sample Street; that the Escalade was his; that he had no driver's license; that he had a girl friend named Kiki; that he had "two or three" prior felony convictions, one of which was for robbery; and that he was "on papers in Illinois." The second interview produced less accurate information, including the following exchanges:

> Cpl. Severns: Ok, that's good. Let me ask you something alright? You do live at 4009 Bonfield?
>
> Terry Reed: Yeah, I've been there (inaudible).
>
> Cpl. Severns: Ok. Is there anymore narcotics there? None at all?
>
> Terry Reed: I don't know, Like I said, I don't know anything about it, I just visit there.
>
> Cpl. Severns: Ok, but see you live there, that's your place, you pay rent.
>
> Terry Reed: I give the rent to you I'm saying my girl, and she pay the rent

2

* * *

Cpl. Severns: Ok. You willing to sign a permit to search, go back over
there to your place over on Bonfield so we can double check to
make sure there's no more stuff there.

Terry Reed: Naw that's not my place, I can't give you permission for
that.[1]

Police officers transported Mr. Reed to jail.

Cpl. Gregory Early arrived at the scene around 3:50 p.m. with a drug dog.
The dog indicated that drugs were between the driver's seat and the center
console, and Investigator Charles Flanagan withdrew a plastic bag, later found to
contain crack cocaine, from that location.

While all this was going on, Johanna Foster drove into the Family Dollar
parking lot and watched. Police officers learned that she wanted to know what was
happening. Cpl. Severns, who knew Ms. Foster to be Mr. Reed's girl friend, spoke
with her and recorded the conversation, which lasted four to five minutes.

The parties dispute precisely what was said at various times between Ms.
Foster and Cpl. Severns (and when it was said), but the recording contains Ms.
Foster saying that she lived on Alonzo Watson Drive, and also stayed with Mr.
Reed at 4009 Bonfield, the lease for which was in both of their names. On the
recording, Cpl. Severns said there had been complaints about drug dealing at the
Bonfield residence, and asked Ms. Foster if he could search the house. Ms. Foster

---

[1] At the suppression hearing, Mr. Reed objected to this line of Government's Exhibit 6,
the transcript of this recording, because he was uncertain this was the precise statement.
Having listened to that track of Government's Exhibit 4 (the recording itself), the court finds the
transcript accurate, and overrules Mr. Reed's objection. This is what he said.

3

agreed, if she could accompany officers and if they didn't tear it up. Cpl. Severns said he could take Ms. Foster to the house; Cpl. Severns also said he might let her drive there herself, but that topic wasn't raised again. Ms. Foster said no drugs were at the house, but there were guns that belonged to Mr. Reed's friend. Cpl. Severns told Ms. Foster that she wasn't in custody or under arrest.

Cpl. Severns drove Ms. Foster to the Bonfield residence. As is discussed more fully later, Ms. Foster says no one else was in the car, while Sgt. Eric Kayser says he rode with them. At the Bonfield residence, with Cpl. Severns and Ms. Foster still in the unmarked police car, Ms. Foster balked at signing the consent to search form. Ms. Foster spoke for some time to her sister, who stood alongside the car. They tried to telephone Ms. Foster's sister's attorney for advice. The parties dispute the discussions occurring during that period, but Ms. Foster eventually signed the consent to search form at 4:26 p.m.

Ms. Foster accompanied officers into the house. The officers found guns and evidence of domain, after which Cpl. Severns and Special Agent David Albritten of the Bureau of Alcohol, Tobacco, and Firearms conducted another recorded interview of Ms. Foster.

Between the events of March 27 and the July 31 suppression hearing, Cpl. Severns was killed in the line of duty.

II

Mr. Reed moves to suppress the evidence on the ground that the seizures at the Family Dollar site and at the Bonfield residence violated his Fourth Amendment right to be free from unreasonable search and seizure. Mr. Reed argues, first, that the stop and arrest were not supported by probable cause; second, that Ms. Foster's consent to search was insufficient in light of his own refusal to consent; and third, that even if Ms. Foster's consent could have supported a search, it was not given voluntarily. The government disagrees with each argument, and argues further that the search of the residence was reasonable by virtue of exigent circumstances.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "With few exceptions, the Fourth Amendment prohibits the warrantless entry of a person's home to make an arrest or conduct a search." United States v. Brock, 417 F.3d 692, 694 (7th Cir. 2005). Today's case requires the court to consider two of those exceptions: the exception for a warrantless search of a driver and the passenger compartment of the vehicle incident to the arrest of the driver on probable cause, see United States v. Pittman, 411 F.3d 813, 816 (7th Cir. 2005); United States v. Jackson, 377 F.3d 715, 716 (7th Cir. 2004), and the exception for consented searches.

> Probable cause for an arrest exists if, at the time of arrest, the officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a

5

suspect has committed, or is committing, a crime. Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest. Because police officers are entitled to rely on their experience in assessing probable cause, their judgments deserve deference.

United States v. Brett, 429 F.3d 725, 728 (7th Cir. 2005). The probable cause and warrant requirements don't apply if an authorized party voluntarily consents to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Johnson, 427 F.3d 1053, 1057 (7th Cir. 2005).

A

Probable cause existed to stop and arrest Mr. Reed. Cpl. Severns recognized Mr. Reed as the Escalade's driver. Cpl. Ingle, Investigator Flanagan, and Sgt. Battani all testified that Cpl. Severns had radioed before the stop that Mr. Reed was driving the Escalade, and Cpl. Severns' involvement in the ongoing investigation corroborates his ability to recognize Mr. Reed.

That a warrant existed for Mr. Reed's arrest and that he was driving on a suspended driver's license both are uncontested, but Mr. Reed contends that Cpl. Severns didn't know those things before the stop, and so had no probable cause for the arrest. The court is persuaded to the contrary. Cpl. Ingle, Inspector Flanagan, and Sgt. Battani all testified that Cpl. Severns radioed that Mr. Reed was wanted on a warrant when he directed the stop; Sgt. Battani added that he heard a police dispatcher confirm for Cpl. Severns that Mr. Reed was wanted on a warrant and that his license was suspended. Cpl. Severns' involvement in the

6

ongoing investigation corroborates that he might have known, even without the dispatcher's confirmation, that Mr. Reed was wanted.

As Mr. Reed notes, the Bureau of Motor Vehicles computer printout introduced at the suppression hearing shows Cpl. Severns as the "requester" at 5:55 p.m., well after the stop and arrest. Sgt. Battani, though, explained that it isn't uncommon for an investigating officer preparing a packet for a felony charge —as Cpl. Severns would have been doing by 6:00 p.m.—to request BMV and NCIC reports a second time. Accordingly, while the evidence is not conclusive, the court remains persuaded that Cpl. Severns (and so the officers acting with him, by imputation), knew before stopping Mr. Reed that Mr. Reed was driving illegally and was wanted on an arrest warrant.


B


Mr. Reed argues that Ms. Foster's consent to search the Bonfield residence was ineffective for two reasons: he refused to consent, and her consent was not voluntary.


1


The first of these arguments draws its force from <u>Georgia v. Randolph</u>, 126 S. Ct. 1515 (2006), in which Americus police sergeant Brett Murray faced squabbling spouses. Each spouse contended that the other abused drugs and alcohol, and the wife told Sgt. Murray that the house contained evidence of the

husband's drug use. Sgt. Murray asked the husband for permission to search, and the husband unequivocally refused. Sgt. Murray turned to the wife, who consented. The search led first to what appeared to be cocaine, then (when the wife withdrew her consent), to a search warrant, a felony charge, a conviction, and a series of appeals.

Ultimately, the Supreme Court held that the wife's consent was ineffective under the circumstances that Sergeant Murray faced: "We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 126 S. Ct. at 1526. Mr. Reed claims benefit from the Randolph rule: like Mr. Randolph, he refused to consent, his co-habitant consented, and the fruits of the search are to be used against him in a criminal prosecution.

For two reasons, this case is not Randolph. First, Mr. Reed wasn't present at the house to deny the police permission to enter. Mr. Reed concedes this, but argues that his absence should make no difference because the police knew where he was (they had taken him to jail), knew that he lived in the place to be searched (having so learned from both their separate drug investigation and Ms. Foster), and knew that he had declined Cpl. Severns' request for consent. Each point is factually accurate and, were the Randolph holding divorced from its facts and the Court's discussion, might provide adequate basis to say his absence made no difference.

The Randolph Court, though, took great pains to preserve the vitality of its holding in United States v. Matlock, 415 U.S. 164 (1974). In Matlock, the defendant, a bank robbery suspect, had been arrested in the large yard of the home in which he was living and placed in a police car parked nearby. Police then went to the home and obtained Gayle Graff's consent to search the room she shared with the defendant. The Supreme Court held that the evidence found in that room was admissible against the suspect because the cohabitant's consent made the warrantless search reasonable.

In explaining that Matlock retained its full vitality, the Randolph Court wrote,

> . . . we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.
>      This is the line we draw . . ..

126 S. Ct. at 1527. Mr. Reed's argument would require this court to re-draw that line, which is not this court's role in a judicial hierarchy.

The importance of this requirement that the objector be "at the door" is underscored by the care with which the Court crafted its opinion, referring always to one who "is present at the scene and expressly refuses to consent," *id.* at 1519, "a second occupant physically present and refusing permission," *id.* at 1520, "a fellow tenant [who] stood there saying, 'stay out,'" *id.* at 1523, "a present and

objecting co-tenant," *id.* at 1523, "a physically present resident," *id.* at 1526, and "a physically present inhabitant's express refusal of consent," *id.* at 1528.

This limitation is fully consistent with developing interpretation of a constitutional clause addressing "unreasonable" searches. Warrantless searches generally are unreasonable under our constitutional understanding, and the courts presume them to be so. <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967). But a search performed pursuant to an occupant's voluntary and express consent ordinarily cannot be called unreasonable, though it can be called warrantless. Accordingly, courts generally view an occupant's consent as overcoming the presumption that a warrantless search was unreasonable. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).

The situation that confronted Sergeant Murray at the Randolph home in Americus, though, made action on the consent less reasonable than usual: both spouses were at the doorway, one inviting entry, the other forbidding it. This combination of events, the Supreme Court held, rendered a search in reliance on one cohabitant's consent unreasonable. But the <u>Randolph</u> Court did not go further to indicate whether other instances of withheld consent by a single occupant might render a warrantless search unreasonable. The Court endeavored to draw the line between the unreasonableness of proceeding when an occupant is present and forbids state entry and, for example, the reasonableness of police accepting an occupant's consent to search notwithstanding a sign posted at the front door declaring that an occupant of the residence forever forbids police entry.

The second reason for <u>Randolph</u>'s inapplicability is that Mr. Reed didn't object to the search in the sense meant by the <u>Randolph</u> Court. Mr. Reed did not object to officers searching the residence; he did not forbid their entry. He declined to consent because (he claimed, falsely) "that's not my place, I can't give you permission for that." The officers' belief and later confirmation that it was his place didn't change the nature of Mr. Reed's reply.

There often is no difference between a speaker telling callers that they can't come in and a speaker telling callers that he can't let them in. Under <u>Randolph</u>, though, there is a difference. The <u>Randolph</u> Court likened the situation facing Sergeant Murray to a visitor to a residence: "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" <u>Georgia v. Randolph</u>, 126 S. Ct. at 1522-1523. The same caller's confidence would be unshaken if one occupant said "come in," and the other said, "this isn't my place."

<u>Georgia v. Randolph</u> doesn't require police officers to obtain affirmative consent from every known occupant of a residence. They had the consent of one occupant—Ms. Foster. No other occupant was present and objecting. If Ms. Foster's consent was voluntary, the entry and search were reasonable.

11

2

Mr. Reed contends Ms. Foster's consent was not voluntary. The government has the burden of proving the voluntariness of her consent by a preponderance of the evidence. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>United States v. Villegas</u>, 388 F.3d 317, 325-326  (7th Cir. 2004). Courts evaluating voluntariness of a consent to search consider the totality of the circumstances, including:

> (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.

<u>United States v. Sandoval-Vasquez</u>, 435 F.3d 739, 744 (7th Cir. 2006).

Resolution of the voluntariness issue begins with a credibility determination: the parties dispute what transpired between Ms. Foster and Cpl. Severns. Ms. Foster testified that: upon her arrival, the police immediately searched her vehicle without asking or obtaining her consent; she was told to get into a small unmarked police car with Cpl. Severns and didn't feel free to leave (but she was told in response to her question that she was not under arrest); that Cpl. Severns told her that if she didn't consent to a search of the home, he would seize both her and the house; that Cpl. Severns told her several times to sign the consent form and said she shouldn't "take the weight" for Mr. Reed. Ms. Foster testified that she sat with Cpl. Severns in the car outside her house for about 15

minutes, crying and upset, and that he identified a car as containing a prosecuting attorney who would immediately sign the paper to seize her and the house. She testified that he also mentioned that her children would be taken from her if she did not comply (she also testified that she did not have custody). She testified that while Cpl. Severns allowed her to talk to her sister (though not at first) and her sister tried to phone an attorney, contact with the attorney was never made.

The government's evidence differs significantly from Ms. Foster's testimony. Investigator Flanagan testified that Ms. Foster was excited upon her arrival, but calmed down and remained calm. He testified that Ms. Foster offered to let the officers check her car for drugs when they asked if she had any drugs. He testified that he didn't see or hear her threatened by anyone, either with prosecution or anything else. Investigator Flanagan testified that Cpl. Severns told him at the Family Dollar scene that they were going to the Bonfield residence because Ms. Foster had consented to a search. He testified that Ms. Foster was very calm and very nice to him toward the end of the search. He denied hearing Cpl. Severns tell Ms. Foster that they would get a search warrant if she didn't consent. Investigator Flanagan testified (without contradiction) that an informant had purchased drugs at the Bonfield residence two or three days earlier.

Sgt. Kayser testified that he rode in the car with Cpl. Severns and Ms. Foster from the Family Dollar scene to the Bonfield residence. He testified that during the drive of no more than three minutes, there was discussion of signing

the permit to search the house. He said the officers said only that they wanted Ms. Foster's cooperation. Sgt. Kayser testified that Ms. Foster was calm, though worried about getting herself in trouble, and never expressed unwillingness. Sgt. Kayser testified that he got out of the car upon arrival at the Bonfield residence, and soon thereafter saw Ms. Foster's sister leaning into the car to speak with Ms. Foster, a conversation that lasted ten minutes or so. He testified that Ms. Foster appeared to be crying and scared when she got out of the car.

Sgt. Battani testified that Cpl. Severns told him at the Family Dollar scene that Ms. Foster was going to allow a search, and asked Sgt. Battani to accompany the officers to the Bonfield residence. He testified that he stayed in the living room with Ms. Foster during the search and described her as pleasant, sociable, and cooperative. He testified that it was Ms. Foster who told the officers where to look for the guns.

Cpl. Severns' report of the incident was admitted into evidence at the hearing. That report described Cpl. Severns' dealings with Ms. Foster up to the discovery of the guns this way:

> During the stop of Reed, I saw a person arrive that I immediately recognized from my investigation also. This person was Johanna Foster, who I know to be Reed's girl friend that lives at 4009 Bonfield. Foster pulled into the parking lot and exited her vehicle to watch what was going on. Upon completion of the stop with Reed, I asked Foster if I could speak to her. I also recorded my conversation with Foster via digital recorder. Foster told me she lives on Alonzo Watson Dr. I asked Foster about 4009 Bonfield. Foster stated that they both live on Bonfield but the lease is in her name. I told her I wanted to talk to her about some narcotic complaints I was receiving about her house. I told her that I would like to get her permission to search her

14

house. She stated she would give permission if she goes with me, and if I don't tear up the house. I asked if Terry had any guns and if there were guns in the house. She told me that there were two guns in the house. She stated there was nobody in the house and no narcotics were in the house. She stated she would comply with us. I told her she was not under arrest. I let her call her kids. She again stated I'll comply to the fullest. I then drove Foster to her house in my car.

Once at 4009 Bonfield I read Foster her Miranda warning, as well as the Warning & Consent to Search. Foster stated she was unsure if she wanted to sign the permit. Foster asked if she could talk to a female who was standing outside the car. I let Foster talk to this female about giving permission to search the house. Foster and this female stated they wanted to call an attorney before she made a decision. Foster and this female then called someone via cell phone. Foster then stated they talked to Attorney David Keckley, and stated she would sign the form. Foster then signed the permit to search giving us permission to search the house.

Foster then led me up to the house and let me in the front door. Foster led me to the SE bedroom where she stated the guns should be on the shelf in the closet. I then looked on the shelf and found a white bank bag. I looked in the bank bag and found two fully loaded guns. . . . .

The court approaches Cpl. Severns' report cautiously. Mr. Reed had no opportunity to cross examine Cpl. Severns to test the report's accuracy, and several portions of the report conflict inexorably with Ms. Foster's testimony. Although the rules of evidence do not fully apply at a suppression hearing, the reasons for those rules do not fall entirely aside simply because the court is conducting a pretrial hearing rather than a trial.

Cpl. Severns also left behind digital recordings of his interviews with Ms. Foster, and those recordings tip the scale strongly in favor of the government's

view of the facts. The recording identified at trial as "interview #1" with Ms. Foster

discloses the following exchange between Cpl. Severns and Ms. Foster:

> Cpl. Severns: Well, I, uh, I've been wanting to talk to you anyway about some narcotics complaints we're receiving.
>
> Johanna Foster: Ok.
>
> Cpl. Severns: About your house.
>
> Cpl. Severns: Ok?
>
> Johanna Foster: There or there.
>
> Cpl. Severns: There.
>
> Cpl. Severns: Is this your phone? Is it ringing? Don't answer it. Um, I'm, I'm getting some complaints that there's some dope dealin and some stuff goin on at the house there. Ok?
>
> Johanna Foster: Ok.
>
> Cpl. Severns: What I'd like to do is get your permission and go back there and search the house.
>
> Johanna Foster: If I go with them and they promise not to tear it up.
>
> Cpl. Severns: Yeah and we don't, We won't tear it up, it'll be me and him. Do you got a problem with that? No? Ok. Um, There's nothing in, in the vehicle?
>
> Johanna Foster: No.

At the hearing, Ms. Foster testified that the recorded request wasn't the first

time Cpl. Severns asked for her permission to search the Bonfield residence, and

the previous requests were not recorded. There were a lot of things, she testified,

that weren't on the tapes.

16

That testimony is not credible. Immediately before the portion of the interview just quoted, this exchange occurred:

Cpl. Severns: Hey guess what? All right. What's your name?

Johanna Foster: Johanna.

Cpl. Severns: Johanna. Foster?

Johanna Foster: Yeah.

Cpl. Severns: Where you live at?

Johanna Foster: I live at 514 Alonzo Watson Drive.

Cpl. Severns: 504 Alonzo Watson Drive?

Johanna Foster: 514.

Cpl. Severns: 514? What about 4009 Bonfield?

Johanna Foster: He stay there, but...

Cpl. Severns: He stays there?

Johanna Foster: See we both...

Cpl. Severns: You live there too?

Johanna Foster: Yeah.

Cpl. Severns: Everything's in your name? Is the lease in your name there?

Johanna Foster: I'm on the lease.

Cpl. Severns: Are you?

Johanna Foster: It's in both of our names.

Cpl. Severns: Who else is there? Anybody there right now?

Johanna Foster: No.

This exchange is senseless if there were prior requests for permission to search 4009 Bonfield. Ms. Foster would not have made Cpl. Severns draw the Bonfield address from her with such difficulty had they already discussed a potential search of the residence. She first gave another address as her residence, then said Mr. Reed stayed there, then finally conceded that she lived there and her name was on the lease.

Ms. Foster immediately agreed to a search of 4009 Bonfield, subject to care not to destroy things. It is within the realm of imagination that when she began to change her mind, Cpl. Severns resorted to threats of Ms. Foster's arrest and prosecution, of foster care proceedings, and of seizure of the residence, and lied to Ms. Foster about the ease and speed with which a search warrant might be obtained. But there is no evidence that Cpl. Severns did such things when Ms. Foster began to waffle on a prior agreement to allow the search: Ms. Foster testified that she was bullied from the outset. That testimony is not credible in light of the taped "interview #1."

That finding takes enough starch out of Ms. Foster's testimony for the court to credit fully the scenario the government presented. The court is persuaded by a preponderance of the evidence that Ms. Foster's vehicle was not searched without her consent; that she was not made to sit with Cpl. Severns against her will; that she was not told she and her house would be seized if she did not consent to the search; that Cpl. Severns did not say a prosecuting attorney was outside the car or that her children would be taken from her if she did not comply.

18

Returning to the factors courts consider in determining the voluntariness of a consent to search, Ms. Foster is a 32-year-old adult of reasonable intelligence. The record doesn't disclose her education, but she was poised and articulate when testifying at the suppression hearing. She knew she could refuse to consent, and was given a chance to talk with an attorney before finally deciding. She wasn't detained or in police custody (she was told she was not under arrest, and Cpl. Severns seemed amenable to her request to drive her own vehicle to the Bonfield residence), but she was in Cpl. Severns' car for 20 to 25 minutes (including the time at the Family Dollar scene and transport to the Bonfield residence). Her consent was both immediate (at the Family Dollar scene) and, after she began to have second thoughts, prompted by multiple requests by Cpl. Severns. No physical coercion was used. There was discussion of obtaining a search warrant should she decline consent, but (particularly in light of the pre-existing investigation) the record would not support a finding that the search warrant was an empty threat. *See* United States v. White, 979 F.2d 539, 542 (7th Cir. 1992) ("Baseless threats to obtain a search warrant may render consent involuntary. ... When the expressed intention to obtain a warrant is genuine, however, and not merely a pretext to induce submission, it does not vitiate consent.").

Cpl. Severns encouraged Ms. Foster to sign the consent form, as she had said she would do before Cpl. Severns led other officers to Bonfield Street, where other occupants of the house saw them and saw Ms. Foster in his car. The tone of the recorded conversations persuade the court that Cpl. Severns didn't badger

19

her; he treated her professionally and courteously. *See* <u>United States v. Bernitt</u>, 392 F.3d 873, 877 (7th Cir. 2004) (defendant was not badgered or threatened, though he was detained in back seat of police car).

That she was crying when she got out of Cpl. Severns' car does not indicate her consent was involuntary. Ms. Foster faced a difficult choice. Mr. Reed is her boy friend even today. She knew guns were in the house, and she knew where they were. She knew Mr. Reed was a convicted felon. She also knew police suspected that drugs had been sold from her home. She may well have considered the risk a residence-based narcotics conviction might pose to her parental rights. *See* <u>United States v. Santiago</u>, 428 F.3d 699 (7th Cir. 2005) (agent's statement that makes accused think about consequences to his family not inherently coercive or psychological pressure). The difficulty of the choice does not render it involuntary.

The government has shown, by a preponderance of the evidence, that Ms. Foster's consent to the search was voluntary.

III

The searches of Mr. Reed's person, vehicle, and residence did not offend the Fourth Amendment. The court DENIES his motion to suppress [Docket No.12].

SO ORDERED.

20

ENTERED:   <u>    August 3, 2006    </u>



<u>    /s/ Robert L. Miller, Jr.    </u>
Robert L. Miller, Jr., Judge
United States District Court

cc:   T. Reed
       J. Kimmel
       J. Barrett